GILBERT G. OTERO
District Attorney
ROLAND WAYNE ROBINSON (State Bar No. 89996))
Deputy District Attorney
Administration Center
940 W. Main Street, Suite 102
El Centro, California 92243
Telephone: (760) 482-4331
Telecopier: (760) 482-4474

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| The People of the State of California,<br><br>    Plaintiff,<br><br>vs.<br><br>COLE JOSEPH DOTSON,<br><br>    Defendant. | Case No.: 12cr917-AJB<br><br>PEOPLE'S RESPONSE TO DEFENDANT'S MOTION TO DISMISS THE CHARGES BASED ON SUPREMACY CLAUSE IMMUNITY<br><br>DATE: MAY 24, 2012<br>TIME: 9:00 A.M.<br>DEPARTMENT: 12 |

COMES NOW, the People of the State of California, by and through their attorneys of record, GILBERT G. OTERO, District Attorney, by ROLAND WAYNE ROBINSON, Deputy District Attorney, and hereby submits this RESPONSE TO DEFENDANT'S MOTION TO DISMISS THE CHARGES BASED UPON SUPREMACY CLAUSE IMMUNITY.

**I**
**FACTS**

Cole Joseph Dotson ("Dotson" or "defendant") is a Special Agent of the United States Immigration and Customs and Enforcement Agency (ICE). On the night of December 29, 2009, while driving alone at high speed in an official, unmarked, government vehicle, he ran a clearly marked stop sign at the intersection of Bowker and Heber Roads in rural Imperial County and collided with another vehicle that had entered the intersection. As a result of the collision, three people in the other vehicle died while two others were seriously injured. Dotson suffered moderate injuries.

At the time of the collision, Dotson had been attempting to follow a drug smuggler and fellow undercover agents who were traveling on a parallel route. Although his vehicle was equipped with working emergency lights and siren, Dotson never employed them. According to California Highway Patrol (CHP) investigators, the Ford Taurus Dotson was driving had no mechanical defects nor were there any adverse weather conditions that contributed to the accident. In their view, the sole cause of the accident was the defendant's failure to stop at the stop sign before he entered the intersection of Bowker and Heber Roads.[1]

After an unsuccessful attempt at obtaining an indictment from the Imperial County Grand Jury, the District Attorney's Office, by way of complaint, formally charged the defendant with three felony counts of vehicular manslaughter (Cal.Pen.Code, § 192(c)(1)) on April 20, 2011. A preliminary hearing was held on October 25 and 26, 2011, at the conclusion of which the defendant was held to answer on all charges. A felony information was subsequently filed in Imperial County Superior Court, to which Dotson pled not guilty at his arraignment on November 17, 2011. This Court granted the defendant's motion for removal pursuant to 28 U.S.C. § 1142, et.seq. on February 17, 2012. Dotson has since filed the instant motion seeking dismissal based upon Supremacy Clause immunity. *Motion to Dismiss the Charges Based Upon Supremacy Clause Immunity*, filed April 19, 2012 at p. 22 (hereinafter, *Defendant's Motion.*) For the reasons that follow, the People respectfully urge the Court to deny the motion.

## II
## SUPREMACY CLAUSE IMMUNITY

As pertinent here, Article VI of the United States Constitution states:

> This Constitution, and the Laws of the United States which shall
> be made in Pursuance thereof; and all treaties made, or which
> shall be made, under the Authority of the United States, shall be
> the supreme Law of the Land; and the Judges in every State
> shall be bound thereby, any Thing in the Constitution or Laws
> of any State to the Contrary notwithstanding.

---

[1] According to CHP accident reconstructionist Scott Parent (Parent), Dotson entered the intersection traveling somewhere between 79 and 81 miles per hour when he passed the limit line, the location where he was supposed to have stopped the vehicle.

With these words the Framers of the Constitution left no doubt that, as between federal and state laws, federal law is to govern whenever there is a conflict. However, certain periods of our nation's history—particularly, the Civil War, Reconstruction, and the Civil Rights Era—created such severe cleavages between the Federal Government and the States as to lay challenge to the very notion of federal supremacy. Such times were particularly challenging to those charged with executing federal policy in certain geographical areas of the country. But, even today, long after the end of the most terrible of these epochs, tensions still exist between the Federal Government and the States. And while today's tensions are not as apt to tear the country apart as those during the epochs listed above, they nevertheless create interesting challenges in day to day governance of the nation. One such tension lies at the heart of this case: namely, what to do when an agent of the Federal Government runs afoul of a state's criminal law while in the performance of his federal duties. Dotson answers that question by seeking to interpose the doctrine of Supremacy Clause Immunity between himself and the People of the State of California. *Defendant's Motion* at p. 2.

As the name suggests, the doctrine has as its basis the supremacy of the Federal Government. As the U.S. Supreme Court explained in *Tennessee v. Davis*:

> [The Federal Government] can act only through its officers and agents, and they must act within the States. If, when thus acting, and within the scope of their authority, those officers can be arrested and brought to trial in a State court, for an alleged offense against the law of the State, yet warranted by the Federal Authority they possess, and if the general government is powerless to interfere at once for their protection. . .the operations of the general government may at any time be arrested at the will of one of its members.

(*Tennessee v. Davis*, 100 U.S. 257, 263 (1880)).

The doctrine's rationale lies in the generalized fear that, if federal agents knew they could be subjected to state criminal prosecution for actions their jobs require them to perform, they would be reluctant to perform the job at all, or at least not as conscientiously, as they otherwise might. Seth Waxman, *What Kind of Immunity? Federal Officers, State Criminal Laws, and the Supremacy Clause*, 112 Yale L.J. 2195, 2231 (2003). As Waxman points out, "[this would] make it extremely difficult, if not impossible, for the federal government to function. Even the

most dedicated federal servant would be reluctant to do his job conscientiously if he knew that it could mean prison time in the state penitentiary." *Ibid.* Hence, the need for the doctrine of Supremacy Clause Immunity, the general contours of which were initially set forth by the Supreme Court in the seminal case of *In re Neagle*, 135 U.S. 1 (1890).

### (A)
### IN RE NEAGLE

In the summer of 1889, Stephen J. Field, Associate Justice of the United States Supreme Court, arrived in California for his annual sitting with the U.S. Circuit Court. As he traveled by train between Los Angeles and San Francisco, he was accompanied by David Neagle, a deputy U.S. Marshal, specifically assigned to protect Justice Field, both in and out of court. While Field and Neagle were sitting in the train's dining car, David S. Terry (Terry) and his wife, both angry litigants who had in the past been held in contempt of court by Field, entered the same car. Knowing that Terry had both publicly threatened to kill the Justice and that he normally carried a bowie knife—he had seen one hidden in his waist band when he arrested Terry the year before—Neagle closely watched the couple. Upon seeing Field, Mrs. Terry hurriedly left the dining car while Terry sat down not far from where the Justice sat.

While Mrs. Terry was still away from the dining car, Terry got up and walked up behind Justice Field and began hitting him about the head area with his fists. Neagle arose from his seat with revolver in hand and in a very loud voice shouted: "Stop! Stop! I am an officer!" Terry turned towards Neagle. Apparently recognizing Neagle, Terry reached into the bosom area of his coat. Fearing that he was reaching for a bowie knife, Neagle fired two shots, killing Terry. A later search of the body revealed that Terry had been unarmed.

Neagle was arrested and charged by California authorities with Terry's murder. Neagle, in turn, filed a writ of habeas corpus contending that had been engaged in the lawful course of his federal duties protecting Justice Field when he shot Terry; therefore, he could not be tried by state authorities. The Supreme Court agreed:

> [I]f the prisoner is held in state court to answer for an act which
> he was authorized to do by law of the United States, which it was
> his duty to do as marshal of the United States, and if in doing that
> act he did no more than what was necessary and proper for him to

>    do, he cannot be guilty of a crime under the law of the State
>    of California.  When these things are shown, it is established
>    that he is innocent of any crime against the laws of the State,
>    or any authority whatever.  There is no occasion for any
>    further trial in the state court, or any court.  The Circuit
>    Court of the United States was as competent to ascertain these
>    facts as any other tribunal, and it was not at all necessary
>    that a jury should be impaneled to render a verdict on them.

(*Id.,* at p. 75.)

In the Court's view, ascertainment of Supremacy Clause Immunity is to be had by only looking to federal and not state law. *Johnson v. Maryland*, 254 U.S. 51, 56-57 (1920).  And the requirements are only three:  First, was the agent authorized to perform the act by the laws of the United States?  Second, was it the duty of the agent to perform the act?  And, finally, in performing the act, did he do no more than what was necessary and proper for him to do?  If the answer to all three questions is "yes" then, under *Neagle*, immunity attaches and state prosecution is foreclosed.  Waxman, *supra*, 112 Yale L.J. at p. 2233.  However, by that same reasoning, if the action is not authorized by the laws of the United States or it was not the duty of the agent to perform the act, or if the agent went beyond that which was necessary and proper for him to perform, then immunity does not attach and the state may proceed with its prosecution. *Mesa v. California*, 489 U.S. 121 (1989)(post office employee involved in traffic accident not entitled to remove case to federal court.)[2] See, also *Maryland v. Soper*, 270 U.S. 9, 33 (1926)(holding that a federal officer seeking removal of a state prosecution to federal court must exclude the possibility that [criminal charge] was based upon acts or conduct of his not justified by his federal duty.")

Dotson maintains that he satisfies the requirements of *In re Neagle*.  He maintains that, at the time of the accident, he was on duty and engaged in the active surveillance of a suspected drug dealer.  (*Defense Motion* at p. 15.)  He also maintains that it was necessary and proper to

---

[2]  Strictly speaking, *Mesa* dealt with the issue of removal to federal court, but as Seth Waxman adroitly observed, "[A] defendant's inability even to satisfy the standard for removing the prosecution to federal court confirms his inability to establish any entitlement to immunity from the prosecution itself.  Thus, cases construing the contours of the removal statute also bear on the underlying question of immunity." Waxman, *supra*, 112 Yale L.J. at p. 2231 fn. 153.

drive as he did because he "needed to get closer to his team." *Id*., at p. 6.  We certainly do not dispute that, as a federal narcotics officer, that his duties would necessarily include the surveillance of both known, as well as suspected, drug dealers.  What the People do dispute, however, is that it was "necessary and proper" for him to drive in the manner that he did, and it is to a discussion of that requirement that we now turn.

## (B)
## THE NECESSARY AND PROPER REQUIREMENT

For immunity to attach, in addition to the requirement that the federal officer's actions were authorized by the laws of the United States, it must also be true that the officer "did no more that what was necessary and proper for him to do." *In re Neagle*, *supra*, 135 U.S at p. 75. In assessing this requirement with regard to Neagle's actions, the Supreme Court concluded, based upon all the circumstances, that the agent "was correct in the belief that without prompt action on his part the assault of Terry upon the judge would have ended in the death of the latter; that such being his well-founded belief, he was justified in taking the life of Terry, as the only means of preventing the death of the man who intended to be his victim. . ." *Id*., at pp. 75-76.

In the case of *Clifton v. Cox*, 549 F.2d 722 (9th Cir. 1977) the Ninth Circuit read the necessary and proper requirement as having both a "subjective" and "objective" component:

> Determination of whether petitioner's shooting of Dickenson was necessary and proper, we find, must rest not only on the subjective belief of the officer but also on the objective finding that his conduct may be said to be reasonable under the existing circumstances. Proper application of this standard does not require a petitioner to show that his actions was in fact necessary or in retrospect justifiable, only that he reasonably thought it to be.

(*Id.,* at p. 728.)

The Ninth Circuit further stated:  "Essential to [the Necessary and Proper] determination, assuming the truth of the state's evidence, is whether the official employs means which he cannot honestly consider reasonable in discharging his duties or otherwise act out of malice or with some criminal intent." *Ibid*.  This latter statement would seem to fall more on the subjective side as opposed to the objective reasonableness of the officer's actions.  In other words, as part of determining what the subjective belief of the officer was at the precise moment of conflict, a

court can look to the means he or she employed to determine whether the officer could have honestly believed that those means were reasonably necessary.  Thus, based upon all the surrounding circumstances—Terry's well publicized threats towards Justice Field; his known habit of carrying a bowie knife in his waist band; the actual beating about Justice Field's head; Terry's reaching into the bosom of his coat—led Neagle to believe that prompt action was needed to save Justice Field's life, and that the use of his revolver what was reasonably called for in that situation.

In his motion, Dotson, like Neagle before him, attempts to demonstrate that his actions satisfy the necessary and proper standard.  *Defendant's Motion* at p. 18.  But, unlike in *Neagle*, several factors counsel against this Court finding that he has done so.  First, Dotson must have known that the manner in which he was driving was in direct violation of ICE policies and procedures concerning emergency driving.  During the grand jury proceedings, another ICE agent, Jose Tirado (Tirado), testified that ICE agents are permitted to drive over 100 miles per hours "only in an emergency pursuit," that is when the agent is actually pursuing someone.  Vol. 1 R.T. at pp. 130-131.  Moreover, when driving at that speed, Tirado testified that it is incumbent on all ICE agents to drive with lights and sirens activated, and that they are to stop at all stop signs they encounter.  *Ibid*.  Here, Dotson was not in active pursuit of anyone; he was on a surveillance detail.  At the time of the collision, he was driving on a parallel route away from the main surveillance team with no indication that anyone in the main surveillance body needed emergency assistance.  Furthermore, he drove at speeds which often exceeded 100 miles per hour without activating his lights or siren, in direct violation of ICE policies and regulations.  But, most tragic of all, he failed to stop at a clearly marked stop sign, resulting in the deaths of three people.  Nothing good ever comes from running a stop sign, as any reasonable officer would surely know, thus no reasonable officer in Dotson's position could have ever concluded that running a stop sign at 79 miles per hour was necessary or proper during a surveillance detail.

Moreover, when Dotson's actions are compared to the actions of Agent Tirado that same evening, a stark contrast emerges.  Tirado testified that, upon receiving word that Dotson had been involved in a collision, he responded from west of the U.S. Border Patrol checkpoint near Westmorland, California, and arrived on scene 20-25 minutes later. Surely, coming to a fellow

7

officer's aid following a collision is far more akin to an emergency situation justifying both excessive speed and the use of emergency lights and siren than a surveillance detail like the one Dotson was involved in. Yet, while responding to the collision scene, Tirado testified that he never traveled faster than 10 miles over the speed limit and that he never activated his emergency lights or siren. *Id*., at pp. 123-124.

Another factor that counsel's against a finding that Dotson's actions were necessary and proper is that, from all the circumstances, it appears that the defendant was not familiar with the area in which he found himself. According to his motion, he initially drove "further east than he desired" and that "he was scanning for familiar landmarks to assist him locate a direct route to [his surveillance team], including warehouse lights on Highway 111 that he recalled were there from a previous sighting." *Defendant's Motion* at pp. 6 & 7. These statements are the hallmarks of someone who is not familiar with the area, and if that is the case, this would surely militate in favor of slower, not faster, speed.

Interestingly enough, it also appears that, because he was looking "for the warehouse he expected to be in the vicinity, [that he] does not recall seeing the stop sign on Heber Road." *Id*., at p. 7. Yet, the physical evidence strongly suggests that he did see the stop sign. According to Officer Parent, the CHP accident reconstruction expert who testified at the preliminary hearing, the defendant passed the "Stop Ahead" warning sign 5.8 seconds before impact. According to the powertrain control module (PCM) records for Dotson's Ford Taurus, "the brake switch [came] on adjacent to [that] sign," meaning that the brakes were utilized as Dotson passed the warning sign. *Preliminary Hearing Transcript*, Vol.1, at p. 177, lines 21-25. From then on, according to the PCM, Dotson reduces speed from 101.2 miles per hours six seconds before impact to 90 miles per hour 3.6 seconds before impact, all with the brake lights on. According to Officer Parent, this means that the defendant was "coasting" from the warning sign to just before reaching the stop sign at Bowker and Heber Roads. *Id*., at pp. 175-181. All of this strongly suggests that the defendant saw the stop sign and had begun to slow down for it. But, these same records also reveal that Dotson never depressed the brake hard enough to activate the car's anti-lock braking system (ABS), suggesting that Dotson never intended to stop at the intersection. *Id*., at pp. 179-180. And once he actually reached the intersection, 1.2 seconds before impact,

Dotson floors the accelerator, *id*., at p. 183, lines 11-16, which could mean that the defendant saw the victim vehicle approaching the intersection and belatedly decided to try to outrun it. And, if that is the case, no reasonable person could possibly conclude that Dotson's actions, at that point, were necessary and proper.

## CONCLUSION

Because the manner in which Dotson was driving the vehicle was neither reasonable nor proper, he is not entitled to Supremacy Clause Immunity as set forth in *In re Neagle*. Thus, the defendant's motion must be denied.

The People so pray.

DATED:  May 3, 2012

        Respectfully submitted,

        GILBERT G. OTERO
        District Attorney


        /s/ Roland Wayne Robinson
        Deputy District Attorney

**PROOF OF SERVICE**

I declare that:

I am a citizen of the United States and employed in the city of El Centro, CA. I am over eighteen years of age and not a party to this action. My business address is 940 W. Main Street, Suite 102, El Centro, CA. 92243.

On May 3, 2012 I served the following documents:

PEOPLE'S RESPONSE TO DEFENDANT'S MOTION TO DISMISS THE CHARGES FOR SUPREMACY CLAUSE IMMUNITY on the below attorneys by electronic filing:

Jeremy Warren, Attorney At Law
105 West F Street, Fourth Floor
San Diego, CA. 92101
jw@jwarrenlaw.com

Michael Stone, Attorney At Law
200 E. Del Mar Blvd., Suite 350
Pasadena, CA. 91105
secretary@police-defense.com

J.C. Allen, Attorney At Law
200 E. Del Mar Blvd., Suite 350
Pasadena, CA. 91105
J.C.Allen@police-defense.com

                              s/ Roland Wayne Robinson
                              _____
                              Roland Wayne Robinson